United States District Court
Southern District of Texas
ENTERED

DEC 1 0 2009

Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
-BROWNSVILLE DIVISION-

| | | |
|---|---|---|
| CRISTOVAL SILVA-TREVINO, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-09-001 |
| | § | |
| MICHAEL A. WATKINS, *et al.*, | § | |
| Respondents. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING RENEWED PETITION FOR HABEAS CORPUS

The Court has before it the Petitioner's Renewed Petition for Writ of Habeas Corpus, the Respondents' Answer, and the Petitioner's Brief in Support of Renewed Petition and in Response to Respondents' Answer, plus a number of related filings. (Doc. Nos. 32, 36, 40.) Having reviewed the petition, the parties' briefing, and the record as a whole, the Court issues the following order granting the Renewed Petition for Writ of Habeas Corpus, subject to the conditions and restrictions contained herein. (Doc. No. 32.)

I. Introduction

The citizens of South Texas for the most part find the Department of Homeland Security ("DHS") to be a good and efficient neighbor—both in its role as the protector of our borders and our citizenry and in its role as a major employer. Crucial to both of these roles is the apprehension and prompt deportation of aliens whom DHS finds to be dangerous. In the instant case, DHS claims that Cristoval Silva-Trevino ("Silva-Trevino" or "Petitioner") is dangerous, yet it will not deport him. Thus one concludes that either Petitioner is not dangerous or he is being held for some other reason. Either way, DHS cannot apprehend someone, imprison him, and then throw away the key. More

than four years ago, DHS took the then sixty-six-year-old Silva-Trevino into custody pending the resolution of his removal case. Now, the seventy-year-old Petitioner is still without an administratively final order of removal and he is still in detention.

This Court is sworn to uphold the Constitution and so it must grant this petition, but it does so only after giving the Government many months to rectify the situation. This Court's holding is the direct result of the unconscionable action or, more accurately, the unconscionable inaction, of the Government. To take more than four years to deport an alien who voluntarily pleaded guilty to a serious offense—indecency with a minor—not only offends any notion of prompt justice, it breaches any semblance of constitutional propriety. This is especially true given that this Court made it clear to the Government's counsel months ago that immediate action was imperative.

The Court recognizes that the Petitioner on occasion has exercised his rights which has at times delayed the final resolution of this matter. Nevertheless, the total delay caused by Petitioner's actions is a mere fraction of the four years that Silva-Trevino has been in custody. It certainly accounts for no more than one year of Silva-Trevino's incarceration without a resolution—which means the Government has held Silva-Trevino through delays unrelated to the exercise of his rights for at least three years without any resolution, well exceeding the finding by the Supreme Court that the average time for proceedings of this type was less than ninety (90) days or even that Court's conclusion that the proceedings take five months in the vast minority of circumstances where the alien appeals the immigration judge's decision. *Demore v. Kim*, 538 U.S. 510, 529 (2003). This Court warned the Government's counsel on several occasions that the continued inaction by the Government would lead to only one result and has given it over ten months to take action.

2

Obviously, these warnings were ignored. Thus, this Court is left with no other course of action. No one should be imprisoned for four years without a proper adjudication. The Government has failed in this instance to comply with the Constitution and in doing so may arguably be putting the public at risk. Nevertheless, this Court has been given no reason, much less a credible reason, for this delay.

II. <u>Underlying Proceedings</u>

A. Petitioner's Immigration Proceedings

On October 6, 2004, Petitioner pleaded no contest to indecency with a minor under the age of 17, and received a sentence from a Texas state court in Hidalgo County of deferred adjudication and five years probation. (Doc. No. 1 at ¶ 5.) Consequently, he was not sentenced to jail time for the actual crime that gives rise to this entire chain of events. In November 2005, Petitioner was taken into custody and removal proceedings were instituted against him on the basis of his 2004 conviction. (*Id.* at ¶ 6.) On February 9, 2006, the Immigration Judge issued an oral decision finding Petitioner removable. (Doc. No. 1 at Ex. D.) The Board of Immigration Appeals ("BIA") reversed in part the decision of the Immigration Judge in an opinion issued June 6, 2006, finding that his 2004 conviction "does not qualify as a crime involving moral turpitude," and remanded Petitioner's case back to the Immigration Judge. (*Id.*) Then, on August 8, 2006, the BIA vacated its June 6, 2006 opinion, reinstated Petitioner's appeal, and found that the Petitioner's conviction "does not render him inadmissible . . . so as to preclude him from seeking adjustment of status" and again remanded his case to the Immigration Judge to determine whether Petitioner deserved discretionary relief. (Ex. E, Doc. No. 3 at 10.) At this point he had been in custody for approximately one year, but he continued to be held pending further proceedings.

3

On July 10, 2007, the Attorney General *sua sponte* referred Petitioner's removal case to himself for review of the BIA's decision by certification. (Doc. Nos. 1 at Ex. A; 27 at ¶10.) Petitioner's counsel was not notified of the Attorney General's actions until August 8, 2007, and was given no opportunity to submit briefing on the issues being reviewed. (Doc. No. 1 at ¶¶ 8–9.) Silva-Trevino remained in custody throughout this entire period. On November 7, 2008, the Attorney General issued an opinion ordering that immigration judges and the BIA undertake a different analysis to determine whether or not a conviction qualifies as a crime involving moral turpitude. (*Id.* at Ex. A.) Specifically, rather than use the "categorical approach"—under which both the BIA and the Attorney General found that Petitioner's conviction was not one involving moral turpitude— the Attorney General directed the use of a "modified categorical inquiry," and remanded Petitioner's case back to the BIA to apply the modified categorical analysis. (*Id.*)

On December 5, 2008, the BIA issued its opinion remanding Petitioner's case back to the Immigration Judge for the initial determination of whether Petitioner's conviction was a crime involving moral turpitude under the modified categorical approach. (Ex. E, Doc. No. 3 at 28.) On December 8, 2008, Petitioner filed a motion to reconsider the Attorney General's decision. (Doc. No. 27 at ¶ 12.) The Attorney General denied the motion to reconsider on January 15, 2009. (*Id.* at ¶ 13.) Silva-Trevino continued to remain in custody. When this Court issued its February 5, 2009 Order denying without prejudice Petitioner's petition for writ of habeas corpus, the Immigration Court still had not issued its decision, but this Court denied the petition because it was led to believe, based on the estimates of counsel for the Government and Petitioner, that Petitioner's case would be finally decided by August 2009. (Doc. No. 30 at 3–4.) In its initial order denying the petition, the Court therefore gave Petitioner leave to refile his petition "should an immigration judge not

conduct a merits hearing on or before May 1, 2009, or the BIA not issue a final decision on or before August 7, 2009." (*Id.* at 4.)

At first, it appeared that the immigration administrative authorities would meet the deadlines. On April 23, 2009, the immigration judge held a merits hearing and issued a decision finding Petitioner ineligible for adjustment of his immigration status after determining that his 2004 conviction qualified as a crime involving moral turpitude. (Doc. No. 36 at 4.) On May 26, 2009, Silva-Trevino filed notice of appeal with BIA. (*Id.*) Then, the proceedings became more complicated. After the initial briefing schedule was issued on June 23, 2009, the parties litigated various procedural motions, and the briefing deadlines were moved on multiple occasions. (*Id.* at 4–5.) Final briefs were not due until August 20, 2009. (*Id.* at 5; Doc. No. 32 at Ex. N.) Needless to say, the BIA did not issue a final decision by August 7, 2009.

On August 10, 2009, Petitioner refiled his petition for writ of habeas corpus because the BIA had still not issued a final order of removal in his case. (Doc. No. 32.) At a October 9, 2009 hearing before this Court, counsel for the Government and Petitioner informed the Court that the BIA's decision was still pending. This Court indicated that it would have to act unless prompt action was taken. On November 23, 2009, approximately four years after he was initially detained, and over ninety days after the briefing was submitted, Petitioner notified the Court that the BIA still had not issued a decision on his appeal. (Doc. No. 52.) Now months after the briefing was filed, this Court has still not been provided with any explanation of the government's dilatory conduct, nor has it been given any reason to believe that a final ruling will ever be reached in this matter.

B.     Petitioner's Habeas Proceedings in This Court

The petition for habeas corpus was first filed with the Court on January 1, 2009. (Doc. No.

5

1.) On February 5, 2009, this Court denied the initial petition without prejudice, and gave the Petitioner leave to refile the petition "should an immigration judge not conduct a merits hearing on or before May 1, 2009, or the BIA not issue a final decision on or before August 7, 2009." (Doc. No. 30.) On August 10, 2009, Petitioner submitted his notice of refiling of the petition because the BIA had not issued a final decision. (Doc. No. 32.) On August 22, 2009, the Government's Answer was filed. (Doc. No. 36.)

This Court held another hearing on October 9, 2009 pursuant to the Petitioner's request for an Order to Show Cause Why the Court Should Not Release Petitioner on Recognizance or on Minimal Bond and there ordered the parties to submit Proposed Orders Granting the Petition for Habeas Corpus by November 6, 2009. (*See* Doc. Nos. 34, 45.) This gave the Government two additional months to act, yet it did nothing. Pursuant to the Court's order, Proposed Orders were filed by the Petitioner and Government. (Doc. Nos. 46, 47.) As of the writing of this opinion and order, to the best of the Court's knowledge, Petitioner's appeal before the BIA is still pending.

III. <u>Legal Standards Governing Detention</u>

Section 1226(c)(1) of Title 8 provides that aliens who have committed certain crimes must be detained during their removal proceedings. 8 U.S.C. § 1226(c)(1) (2006); *see also Demore v. Kim*, 538 U.S. 510, 513 (2003). In *Demore v. Kim*, the Supreme Court upheld the constitutionality of mandatory detention under § 1226(c), reasoning that detention during deportation proceedings is "a constitutionally valid aspect of the deportation process" because it facilitates the effective removal of deportable aliens. 538 U.S. at 523. A corollary of this principle is that when detention has lasted so long that its "justification – preventing flight – is weak or nonexistent where removal seems a remote possibility at best," then it can no longer bear "a reasonable relation to the purpose for which

6

the individual was committed." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Thus, the Supreme Court distinguished the *Demore* case from that of *Zadvydas* because detention during removal proceedings "necessarily serves the purpose of preventing deportable criminal aliens from fleeing prior to or during their removal proceedings, thus increasing the chance that, if ordered removed, the aliens will be successfully removed." *Demore*, 538 U.S. at 527–28. In contrast, the Court noted that the *Zadvydas* petitioners were aliens "for whom removal was no longer practically attainable." *Id.* at 527 (citations omitted).

Hence, in *Zadvydas*, the Supreme Court held that detention after an alien has been ordered removed cannot be indefinite and must be limited by principles of due process, even though the statute governing post-removal detention does not specify a particular time limit. *Zadvydas*, 533 U.S. at 682, 690; *see also* 8 U.S.C. §§ 1231(a)(1), (a)(6). Specifically, it held that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Based on its reading of Congressional intent, the Supreme Court determined that detention beyond six months would be presumptively unreasonable. *Id.*

The Supreme Court has also distinguished detention under § 1226(c) from the potentially "indefinite" or "potentially permanent" detention under § 1231(a) that it found required limits in *Zadvydas v. Davis*. *Demore*, 538 U.S. at 528–29 (citing *Zadvydas*, 533 U.S. at 690–91). Because detention under § 1226(c) has "a definite termination point," which "in the majority of cases . . . lasts for less than the 90 days [the Court] considered presumptively valid in *Zadvydas*," and only "about five months in the minority of cases in which the alien chooses to appeal," the Supreme Court rejected the habeas petition challenging § 1226(c) mandatory detention. *Id* at 529–31. Notably,

7

throughout the *Demore* opinion, the Court explicitly stated that the detention anticipated under § 1226(c) would be for a brief period of time. *See, e.g., id.* at 513 ("We hold that Congress . . . may require that persons such as respondent be detained for the *brief period* necessary for their removal proceedings.") (emphasis added).[1] The concurrence and fifth vote in favor of the judgment in *Demore* also hinted that the Due Process Clause limits the reach of § 1226(c) detention, concluding that "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary to then inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.* at 532–33 (Kennedy, J., concurring). *See also Tijani v. Willis*, 430 F.3d 1241 (9th Cir. 2005) (conditionally instructing district court to grant writ of habeas where alien had been detained for two years and eight months pursuant to § 1226(c)); *Ly v. Hansen*, 351 F.3d 263, 273 (6th Cir. 2004) (analyzing *Zadvydas* and *Kim*, and holding that "[w]hen actual removal is not reasonably foreseeable, deportable aliens may not be indefinitely detained without a government showing of a 'strong special justification,' constituting more than a threat to the community, that overbalances the alien's liberty interest").

IV. <u>Application</u>

While sympathetic to the rationales underlying the mandatory detention scheme of § 1226(c),

---

[1] *See also Demore*, 538 U.S. at 523 (referring to detention as the "brief period necessary for [petitioner's] removal proceedings"); *id.* at 526 (referring to detention as a "limited period" and detention policy as "narrow"); *id.* at 528 (commenting that the § 1226(c) detention is "of a much shorter duration" than the post-removal period detention in *Zadvydas*); *id.* at 529 (reviewing statistics finding that removal proceedings in 85% of cases are "completed in an average time of 47 days and a median of 30 days") (citations omitted); *id.* at 530 (finding that generally § 1226(c) detention lasts no longer than a month and a half, or five months if the alien chooses to appeal); *id.* at 531 (again referring to detention duration as a "limited period").

8

the Court finds that Petitioner's detention pending his removal proceedings has crossed the line of reasonableness and no longer relates to the goal of the statute. Given the past inaction, it is not reasonable to expect that actual removal will be accomplished; in fact, it is not reasonably foreseeable that it will even be ordered. Earlier this year, the Court denied Petitioner's request for relief because it was led by the Government to believe that Petitioner's proceedings were close to final resolution. (Doc. No. 30 at 3–4.) Nearly eleven months later, Petitioner's appeal before the BIA has still not been ruled upon, and Petitioner has been in custody for more than four years over the course of these proceedings. Although the Government maintains that Petitioner's detention has a termination point, (Doc. No. 46 at 1), this Court has yet to see proof that the Government ever intends to reach that point.

In Petitioner's case, his detention cannot continue consistent with the rights guaranteed by the Fifth Amendment's Due Process Clause. His detention has lasted seven to eight times longer than six-month limit that the Supreme Court considered presumptively reasonable. *See Zadvydas*, 533 U.S. at 701. Moreover, the "likelihood of removal in the reasonably foreseeable future," based upon the record in this case, is virtually nil.[2] The Government has had four-plus years to remove

---

[2] The Supreme Court has suggested that courts should use the "no significant likelihood of removal" standard. *Zadvydas*, 533 U.S. at 701. In giving this guidance, the Court seems to anticipate two different scenarios: (1) where there was a substantive issue as to whether removal was warranted and/or (2) the situation where removal to the other country was warranted, but impossible. Its discussions did not seem to contemplate this situation—where (1) removal is arguably warranted (while this Court makes no finding in this regard, it certainly finds the question of "whether the conviction of a mature man for indecency with a child is a crime of moral turpitude" to be one capable of prompt resolution) and (2) removal is practical, but despite these factors has not been done because the authorities in control have failed to act. Given these facts, this Court finds procedurally there is no likelihood of removal because the authorities in question do not seem willing to act.

9

Silva-Trevino, but has accomplished nothing. This Court gave the immigration officials more than a generous amount of time to reach a decision before it would even reconsider the Petitioner's request for relief, yet Petitioner still awaits a final decision on his removal case. It then gave it another sixty days—still nothing. Nor has the BIA ruled since. The Government has offered not a shred of evidence to show that a final decision is likely to be reached soon or will ever be reached. Given that the goal of detention is to ensure removal, *see Demore*, 538 U.S. at 527–28, the Court finds that it is not reasonably related here because after four years, there is still no final order of removal.[3]

For the foregoing reasons, the Court grants Petitioner's Renewed Petition for Writ of Habeas Corpus (Doc. No. 32) and issues the following order.

V.   Order of Release

It is hereby ordered that the DHS release Petitioner on or before December 20, 2009 from custody for the duration of his removal proceeding, or until further order of the Court, subject to the following conditions:

1. Immediately upon release, Petitioner shall reside at his family home, at ▪▪▪▪▪▪▪▪▪▪▪, Mission, TX 78574, with land-line telephone number 956-▪▪▪▪▪▪. No minors under the age of 18 may reside there.

2. Until such time as the Board of Immigration Appeals ("BIA") issues its decision in the instant case, Petitioner shall report in person once a week between 9:00 a.m. and 11:00 a.m. to the

---

[3] This Court notes if the Petitioner were likely to flee, his destination outside of the United States would most likely be Mexico—the country to which he would ultimately be deported, anyway.

DHS Office of Detention and Removal Operations located at the Harlingen Resident Office, 1717 Zoy St., Harlingen, Texas 78552, on dates specified by DHS unless he is granted written permission to report at another location, date, or time.

3. Petitioner shall report for any removal hearing directed by any office of DHS, including the Executive Office for Immigration Review ("EOIR").

4. Petitioner shall not change his place of residence without permission of this Court.

5. Petitioner shall remain within the limits of Hidalgo County, Texas and Cameron County, Texas, unless given written permission by DHS or the United States Pretrial Services Agency ("PSA") to leave the area. This restriction includes no travel to Mexico. Any passport, visas, or other travel documents that have not already been surrendered to DHS shall be turned over to PSA.

6. Petitioner shall surrender immediately to DHS for removal from the United States if an administratively final removal order is entered against him.

7. Petitioner shall obey all municipal, county, state, and federal laws.

8. Neither Petitioner nor anyone at his residence shall possess a firearm, ammunition or other dangerous weapons.

9. If instructed by PSA to do so, Petitioner shall submit to the PSA Electronic Monitoring Program (EMP) by:

    a. Wearing a non-removable ankle transmitter (bracelet), which will be attached by a PSA officer;

    b. Signing a receipt for the ankle transmitter;

    c. Not removing or tampering with the ankle transmitter except in a life-threatening

emergency or with approval of any PSA officer;

d. Allowing PSA authorized personnel to inspect and maintain the ankle transmitter and receiver/dialer;

e. Allowing all telephone calls from the monitoring center to his residence to be tape-recorded by the monitoring center contractor; and,

f. Charging the ankle transmitter for two hours every day.

10. Petitioner shall register as a sex offender with the State of Texas within seven days of release. He shall provide PSA with written proof of such registration. He shall also comply with all the requirements of his earlier-ordered probation.

11. Petitioner shall comply with all sex offender registration requirements imposed by the State of Texas or federal law.

12. Petitioner shall permit a PSA officer to visit his residence.

13. Petitioner shall not communicate directly or indirectly with the victim(s) named in any count of the indictment in the case styled *State v. Cristoval Silva Sr.*, No. CR-1937-04-B (93rd Dist. Ct., Hidalgo County, Tex.) and shall not go within 1000 feet of any of the victims' residences, places of employment, or places of business.

14. Petitioner shall not supervise or participate in any program that has as participants or recipients, persons under 18 years of age.

15. Petitioner shall be supervised by a competent adult over the age of 21 when any person, including relatives, under the age of 18 is in his presence.

16. Petitioner shall not go in, on, or within 1000 feet of premises where children commonly

gather, including a school, day-care facility, playground, public or private youth center, public swimming pool, or video arcade facility.

17. Petitioner shall not associate with known gang members, criminal associates, or be associated with any such activity.

18. Petitioner shall not illegally possess a controlled substance or participate in any unauthorized use of a controlled substance.

19. Petitioner shall follow any prescribed doctors' orders or prescriptions, whether medical or psychological, including taking prescribed medications.

20. Petitioner shall avoid bars, taverns, "cantinas," lounges, pool halls, and all establishments whose primary business or source of income is selling or distributing alcoholic beverages, and avoid the abuse of alcoholic beverages or use of any mind-altering drugs.

21. Petitioner shall avoid all establishments which could be described as being in the adult entertainment business and further shall avoid any and all child pornography or pornography and avoid any business that deals in child pornography or pornography including those on the internet.

22. Petitioner shall not have access to computers, laptops, the internet, photographic equipment, or audio/video equipment. He shall not possess any printed, photographed, or recorded material which may be used to arouse his sexual behavior. The U.S. Pretrial Services Officer shall have the right to confiscate any such equipment or materials.

23. Petitioner shall be restricted to his home from 10:00 p.m. to 6:00 a.m. unless other specific arrangements are made with the Court.

24. Petitioner will undergo a complete psychological evaluation and/or participate in a sexual

offender/mental health program as deemed necessary and approved by PSA and comply with all the rules and conditions of the program. Petitioner will incur costs associated with such programs, based on his ability to pay as determined by the U.S. Pretrial Services Officer.

25. Petitioner shall undergo the search of his person, residence, belongings, personal effects, or any vehicle(s) which he may be operating, or in which he is a passenger, without the prior notice of a search warrant to determine if he is in compliance with the conditions of this release.

26. Petitioner shall post a $25,000 bond of cash with the Clerk of this Court to secure his appearance at any and all further proceedings. At least a 10% deposit must be posted to support this bond. A local resident must be a second signatory (third party custodian) on the bond. This person shall not have a criminal record and must be approved by the PSA Office of this Court and shall be subject to an objection by DHS.

27. Petitioner is to comply with other conditions expressly set forth in the conditions of release.

28. Petitioner or his family has the permission of this Court to take the necessary steps in advance of the December 20, 2009 deadline to insure the compliance with this order and a prompt release.

Signed this 10th day of December, 2009.

                                      Andrew S. Hanen
                                      United States District Judge